IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:

ILLINOIS STAR CENTRE, LLC

Debtor(s).

Chapter 11

Case No. 17-30691

## OPINION

Debtor, Illinois Star Centre, LLC, filed its voluntary petition under Chapter 11 of the Bankruptcy Code on May 4, 2017. Debtor operates a retail shopping center located at 3000 DeYoung Street, Marion, Illinois 62959 (the "Mall"). The debtor determined that it would no longer be economically feasible to continue its business, so it filed a Motion to Reject Unexpired Leases, which was granted on December 18, 2018. On January 14, 2020, the debtor filed a Motion to Sell the Mall (Doc. #184). The Motion to Sell indicates that the ownership group of the debtor, who constitutes the entity Illinois Star 800, LLC, was also seeking to sell the adjacent real property (the "800 Building"), which was not owned by the debtor. The buyer proposed to purchase the Mall and 800 Building for a total price of $3,200,000.00. However, the purchase price did not provide an allocation of the proceeds between the Mall and the 800 Building. In the Motion to Sell, the debtor requests that the Court approve an allocation of the proceeds from the sale of the Mall and 800 Building based upon evidence at an evidentiary hearing regarding the values of the Mall and 800 Building. After no objections were filed to the Motion to Sell, an order was entered on March 3, 2020 granting the Motion (the "Sale Order") (Doc. #209). Subsequently an Amended Sale Order was entered on June 29, 2020 (Doc. #239). The sale closed on July 30, 2020.

The Sale Order requires the Court to determine the value of both the Mall and the 800 Building. The Court conducted a valuation hearing on July 28, 2021. Appraisers for the City of

1

Marion and Illinois Star 800, LLC provided testimony as to the value of both the Mall and 800 Building.

Both appraisers testified that the valuation of real estate is derived from three approaches to value. They are the Cost, Income Capitalization, and Sales Comparison Approaches. Both appraisers also agreed that the Cost Approach was not applicable for either property, so their analyses focused on the Income Capitalization and the Sales Comparison Approaches. Income Capitalization is based on an estimate of the property's possible net income. The Sales Comparison Approach compares the sales of similar properties to the subject property, with certain adjustments to determine a value. Both appraisers used the sale price per square foot as a unit of comparison for the properties.

Based upon the appraisals and testimony provided at the July 28, 2021 hearing, the Court has reached a determination in the value of both the 800 Building and the Mall.

## I.    The Mall

The Mall was constructed in 1991 and originally anchored by four tenants that were independently owned. The Mall is comprised of former retail stores, food court, management office, and common areas and has a gross building area of approximately 320,00 square feet.  At the time of the appraisals, the Mall was vacant. The Mall is located in the City of Marion in Williamson County, Illinois. The City of Marion is located in a Micropolitan Area that has a combined statistical area comprised of approximately 123,000 residents. (Exhibit A, pg. 29). In the City of Marion, the estimated median household income and home value are both below the statewide average, and the unemployment rate is higher than both the statewide and national averages. (Exhibit A, pg. 29).

The Court heard testimony from Illinois Star 800, LLC's witness, Edward Dinan of Dinan Real Estate Advisors, Inc., concerning the value of the Mall. Mr. Dinan values the Mall at $1,400,000.00. Because the Mall was vacant at the time of the appraisal, Mr. Dinan reached this conclusion solely based on the Sales Comparison Approach.

The Sales Comparison Approach is an appraisal technique in which the market value is based on prices paid in actual market transactions. (Exhibit A, pg. 97). The appraiser analyzes recently sold properties similar to the subject property. "The reliability of this technique depends on (a) the degree of comparability of the property appraised with each sale or listing…" (Exhibit A, pg. 97).

Mr. Dinan testified that during the appraisal, the Mall was totally vacant, in poor condition and in need of a major renovation. The Mall had indications of age in its design, color trends, and finishing. There was deferred maintenance and problems with the roof so severe that there were buckets collecting water from holes in the roof during the appraisal. It was in "rough shape." Speaking to his experience with malls in general, Mr. Dinan testified that malls are "dying on the vine." He noted that nationally the number of existing malls has been substantially reduced, and that this is a trend we are going to continue to see. Mr. Dinan described the mall business as becoming economically obsolete, a term he defines as when a business market has "lost its flavor." Mr. Dinan testified that in some instances, malls are having to pay anchor stores to stay. His appraisal states that mall owners provide incentives to attract anchor tenants, including assisting in construction costs and other financial incentives. (Exhibit A, page 49).

Mr. Dinan believes the highest and best use of the Mall is redevelopment. His appraisal states, "The center has failed economically." (Exhibit A, pg. 31). He testified that the market and competition had turned against it, and the Mall had reached the end of its economic life. Mr.

Dinan used four comparables in his Sales Comparison Approach for the Mall valuation. These properties included the Chesterfield Mall in Chesterfield, Missouri, St. Louis Outlet Mall in Hazelwood Missouri (the "Mills Mall"), Midway Mall in Elyria, Ohio, and Lakeshore Mall in Gainesville, Georgia. (Exhibit A, pgs. 60-63). The comparables range from $3.67 to $13.85 per gross square foot sold. Each of the properties was compared directly with the Mall, with adjustments being made for the differences between the comparable properties and the subject. The adjustments are based solely on the general experience and judgment of the appraiser, so it is subjective. Notably, although considered a "comparable" by the appraiser, the adjustments were significant.

The Chesterfield Mall received a 30% adjustment for location, 20% adjustment for access and 15% adjustment for construction quality, amongst several other smaller adjustments. (Exhibit A, pg. 66). Mr. Dinan testified that the Chesterfield Mall is four to five times the size of the Mall in question. The Chesterfield Mall has a superior location and size. It is in a desirable community, has great exposure to the interstate, and is good in terms of visibility, ingress, and egress. The Mills Mall and Midway Mall both received a 20% adjustment for both access and economics, along with multiple other adjustments ranging from 5-10% in areas such as location, size, condition, age, etc. (Exhibit A, pg. 66). Mr. Dinan testified that these two malls were around twice the size of the Mall in question. Additionally, the Mills Mall "didn't take long to fail." It was "out in the middle of nowhere," and the "ingress and egress were difficult." Lakeshore Mall received 15% adjustments on construction quality and condition and 20% adjustments for access and economics, along with other adjustments ranging from 5-10%. (Exhibit A, pg. 66).

Based on the adjustments, Mr. Dinan concluded that the value per gross square foot of the subject Mall is $4.25. Multiplying this value by the area of the Mall (325,384 square feet) leads to Mr. Dinan's Sales Comparison Value of $1,400,000.00 for the Mall (Exhibit A, pg. 68).

The Court finds these "comparables" to be hardly comparable when such adjustments had to be made. The malls provided for comparison were significantly different sizes, locations, and even different types of malls. The Court finds it extremely difficult to see how the "comparables" provide a pathway to determining a value when the degree of comparability is nearly non-existent. When adjustments of over 30% are made to property, it appears that a more comparable sale should be used.

The Court also heard testimony from The City of Marion's witness, Russell Sloan of Sloan Appraisal & Realty Services. Mr. Sloan assigns a value of $2,800,000.00 to the Mall, despite the fact that he testified the Mall "was in need of a lot of renovation." In reaching this value, Mr. Sloan also chose to omit the Income Capitalization Approach, because the Mall was vacant, with "no reliable historical income and expense data attributable to the property."

Therefore, Mr. Sloan's value of the Mall is also based solely on the Sales Comparison Approach. Mr. Sloan's comparables include Bradford Square in Hopkinsville, Kentucky, Towne Square Mall in Owensboro, Kentucky, Cross County Mall in Mattoon, Illinois, and University Mall in Carbondale, Illinois. (Exhibit B, pg. 35). The properties range from $7.96 to $23.36 per gross square foot sold. After significant adjustments were made in categories such as Improvement Age/Condition, and Property Rights Conveyed for some of the properties, Mr. Sloan determined that the value per square foot of the Mall is $8.90 per square foot. Multiplying that value by 310,344 square feet, leads to Mr. Sloan's Sales Comparable Value of the Mall as $2,800,000.00 (Exhibit B, pg. 40).

Unfortunately, the comparable sales provided by Mr. Sloan also fail to provide an accurate valuation of the Mall. Mr. Sloan made no adjustment whatsoever for the Bradford Square and Town Square Mall. According to the appraisal, at the time of sale of Bradford Square, the center had a vacancy rate of only 34%, "a significantly higher occupancy rate than the subject," but Mr. Sloan believed no adjustment was warranted. (Exhibit B, pg. 36). The appraisal states that the Town Square Mall sale, located in Owensboro, Kentucky, has a "slightly larger market," and the occupancy rate was higher at the time of sale. (Exhibit B, pg. 36). Mr. Sloan also testified that the county population where the Town Square Mall was sold is roughly 116,000, whereas the county population of the subject Mall is approximately 66,000. Further, the area of the Town Square Mall is nearly 200,000 square feet more than the subject Mall. (Exhibit B, pg. 37) Despite these differences, no adjustments were made by Mr. Sloan. Although Mr. Sloan provided properties that he believes are extremely similar, as evidenced by his decision to make no adjustment, the Court finds it difficult to believe that these two malls would actually require no adjustment at all.

Mr. Sloan's other two comparables are also off base. Although the comparable sale of the Carbondale Mall was in an area with a similar population, Mr. Sloan's appraisal states that the traffic at the Carbondale Mall remained superior to that at the Marion Mall. The malls were so close in location that the area could not support two malls. It appears that the presence of the Carbondale Mall hinders the ability of the subject Mall to succeed. The appraisal indicates that both University Mall in Carbondale and the Cross County Mall in Mattoon had been upgraded and were considered to be stable and viable. (Exhibit B, pg. 36). How does that compare to the subject Mall that is vacant, deteriorating, and has "lost its flavor?"

Each appraiser's Sales Comparison Approach ultimately came down to making significant adjustments of up to 30%. The two appraisers combined have over 86 years of experience but could not come up with one like property that would represent a fair comparison to the subject Mall. Mr. Dinan testified that ideally, there would be little need for adjustments. However, his appraisal of the Mall shows that all of the comparable sales have a higher trade area population, the sales were larger, the sales had better access, and only one property was actually vacant at the time of the sale. Based on the age and condition, his appraisal states that the Mall is in inferior condition to the comparable sales. Mr. Sloan's comparable sales included centers that were occupied, renovated, and in superior locations.

It appears that the sale of the Mall actually rests upon the value of the land it sits on, with little use for the actual Mall building. The gist of the testimony is that some type of gutting or demolition of part or all of the Mall would be required. Neither appraiser was able to provide a use for the Mall building, and it appears that it would ultimately need to be torn down. It is abundantly clear that the appraisers were not on the same page when it came to a valuation of the Mall. They could not even agree on the area of the mall. While Mr. Sloan used an area of 310,344 square feet (Exhibit B, pg. 40), Mr. Dinan used an area of 325,384 square feet in his valuation of the Mall (Exhibit A, pg. 68), a difference of over 15,000 square feet.

Mr. Sloan values the Mall at $2,800,000.00, yet his appraisal makes indications that the building has little adaptability for other uses and states the performance of malls has begun to deteriorate over the last few years. (Exhibit B, pg. 25-27). Mr. Sloan's appraisal also states, "the economic characteristics and the fact that the property requires numerous physical improvements suggest the need for repositioning and renovation of the property." (Exhibit B, pg. 41). Mr. Sloan

estimates a demolition cost of approximately $1,400,000.00. (Exhibit B, pg. 28). There is hardly any basis for such a steep valuation that fails to account for renovation expenses or demolition.

Because of the numerous issues that the Court finds with both appraisals of the Mall, and the significant adjustments that would be required for "comparable sales," it appears that the most accurate approach is for the Court to first determine the value of the 800 Building. The 800 Building is valuable as is and has tenants producing an income stream, so the Income Capitalization Approach may be utilized along with the Sales Comparison Approach. Once the value of the 800 Building is determined, the Court will subtract the value from the actual sale price of both properties to find the most accurate value of the Mall. Accordingly, the Court must first determine the value of the 800 Building.

## II.    The 800 Building

The 800 Building had been a former anchor tenant of the Mall. It was converted into a multi-tenant retail and warehouse space, and at the time of the appraisals was occupied by two tenants. The gross building area is 66,920 square feet, with 60,900 rentable square feet. (Exhibit A, pg. 20). Approximately 23,100 square feet, or 37.9% of the building was vacant at the time of both appraisals. (Exhibit A, pg. 88).

Mr. Dinan testified concerning the value of the 800 Building. Mr. Dinan testified that the highest and best use of the 800 Building was how it was currently being utilized. The tenants were producing an income stream, and it was a viable operation. He believes the vacant portion of the building could be used for warehouse space.

It is Mr. Dinan's conclusion that the 800 Building has a value of $1,800,000.00. This value was derived by using the Income Capitalization and Sales Comparison Approaches. Discussed more thoroughly below, Mr. Dinan reached a value of $1,220,000.00 in his Income

Capitalization Approach and $1,990,000.00 using the Sales Comparison Approach. Because the Building is partially vacant, Mr. Dinan placed the most weight on the Sales Comparison Approach in reaching his final value.

The Income Capitalization Approach bases the value of an income-producing property as the worth of anticipated future benefits. (Exhibit A, pg. 88). The first step is the development of an income stream for the property. The income stream is then capitalized at a rate taken from the market to develop an indication of value. (Exhibit C, pg. 36). The appraisers used selected economic assumptions and factors in selecting a value.

Using the Income Capitalization Approach, Mr. Dinan reaches a value of $1,220,000.00. (Exhibits A, pg. 96). By subtracting operating expenses from the estimated revenue, Mr. Dinan concludes that the net operating income for the 800 Building is $86,830.00. (Exhibit A, pg. 92). He then divided the net operating income by an overall capitalization rate of 7%. (Exhibit A, pg. 96). The overall capitalization rate is a rate which reflects the direct relationship between a property's income potential and value. (Exhibit A, pg. 93). Dividing the net operating income by the overall capitalization rate equals an estimated market value of $1,240,429.00. Subtracting rent loss of $10,920.00 and leasing commissions of $5,460.00, equals the estimated market value of $1,224,049.00. (Exhibit A, pg. 96). Mr. Dinan rounded this number down to $1,220,000.00 to reach his Income Capitalization value for the 800 Building.

Mr. Dinan's value of the 800 Building based on the Sales Comparison Approach is $1,990,000.00. (Exhibit A, pg. 105). Mr. Dinan found sales of what he determined to be similar properties in terms of construction quality, physical condition and location attributes. These properties include a former Gander Mountain Store in Chesterfield, Missouri, a former Carson Pirie Scott Store in Bourbonnais, Illinois, a former Sports Authority and SportMart in Crystal

Lake, Illinois, a former Toys 'R Us in Marion, Illinois, and a former Sears in Marion, Illinois. (Exhibit A, pg. 102).

Based on the testimony by both appraisers, any adjustments that are made to the properties are based on the appraisers' own subjective experience. According to Mr. Dinan, the former Gander Mountain required an adjustment of 25% for location, 20% for condition, and a 25% adjustment for economic characteristics, leading to a net adjustment per square foot of 39% (Exhibit A, pg. 102). The Carson Pirie Scott Store required a 22% overall adjustment, with adjustments made by Mr. Dinan in categories such as economic characteristics, access and visibility, size, and land-to-building ratio. (Exhibit A, pg. 102). The former Sports Authority required an adjustment of 20% for location and 25% for economic characteristics, along with other smaller adjustments in size, access and visibility, and land-to-building ratio. (Exhibit A, pg. 102).

Using the adjustments based on the properties, Mr. Dinan concludes that the price per square foot of the 800 Building is $30.00 per square foot. The 800 Building consists of 66,920 square feet. Therefore, to compute the estimated market value, the 66,920 square feet was multiplied by $30.00 per square foot, for a total of $2,007,600. Less the rent loss of $10,920 and leasing commissions of $5,460, the total market value is $1,990,000.00 according to Mr. Dinan. (Exhibit A, pg. 105).

However, once again, the Court does not believe all of the "comparables" to actually be comparable to the 800 Building. For instance, the former Gander Mountain Store is a free-standing, one-tenant store located in a more populated area, not a multitenant anchor store in southern Illinois. Both the former Carson Pirie Scott Store and former Sports Authority stores are located in the suburbs of Chicago, an area vastly distinguishable from the Marion-Herrin

Micropolitan area. The Court finds the adjustments that needed to be made with the comparables to be substantial. Based upon the location and characteristics of the buildings, the Court considers that the *most* comparable stores from the appraisal are actually Comparable #4, the former Toys R'Us in Marion, Illinois, and Comparable #5, the former Sears, also located in Marion, Illinois. In fact, the former Sears is also a former anchor tenant of the subject Mall. The price per square foot of Comparable #4 is $33.90, and the price per square foot for Comparable #5 is $9.45. The average of the two is $21.68 per square foot. Multiplying this value by the area of the 800 Building (66,920 square feet), totals $1,450,491.00. Subtracting the rent loss ($10,920.00) and leasing commissions ($5,460.00) provided by the appraisal, provides the Court's Modified Sales Comparison Approach Value of $1,434,111.00.

The Court also heard testimony from The City of Marion's witness, Russell Sloan, concerning the value of the 800 Building. Mr. Sloan also used the Income Capitalization and Sales Comparison Approaches in his valuation of the 800 Building.

Mr. Sloan estimates the value of the 800 Building based on the Income Capitalization Approach as $1,179,000.00. (Exhibit C, pg. 47). In his Income Capitalization Approach of the 800 Building, Mr. Sloan, just like Mr. Dinan, divided the projected net operating income of the Building by the overall capitalization rate. However, Mr. Sloan believes the net operating income to be $111,976.00, and the capitalization rate to be 9.5%. (Exhibit C, pg. 47). Dividing the $111,976.00 by the capitalization rate of 9.5%, Mr. Sloan reaches his $1,179,000.00 valuation. (Exhibit C, pg. 47). As noted in his appraisal of the property and testified to at the hearing, Mr. Sloan gave absolutely no value at all in either of his valuations to the vacant area of the building. In his valuations, Mr. Sloan used 41,300 square feet, instead of the actual area of the building (66,920 square feet). According to the appraisal, he considers the vacant area to "not be rentable,

with no income projected for this space." (Exhibit C, pg. 39). Mr. Sloan testified that the vacant part of the 800 Building was functionally obsolete because there was no access to the vacant part of the 800 Building. Mr. Sloan's appraisal states the vacant area formerly utilized access to the Mall, however, with the Mall under different ownership now, the vacant space essentially has no exterior access to public area and is obsolete. (Exhibit C, pg. 20). Based on his opinion that there was no access to the vacant area of the 800 Building, Mr. Sloan chose to assign no value to this area. The Court finds that excluding the vacant area of the Building completely from the valuation to be inaccurate based upon the information learned at the hearing.

The Court heard testimony from Dennis Ballinger, a member of both Illinois Star Centre, LLC and Illinois Star 800, LLC. Based upon the testimony provided by Mr. Ballinger, there does in fact appear to be access to the vacant part of the Building. Mr. Ballinger provided testimony that the vacant part of the Building was formerly rented by a third-party conducting fulfillment for Amazon. The vacant part of the Building was once used as warehouse space for this company, and the employees would access that part of the Building through an entrance near the loading dock on the Building. Further, there is space in the vacant part of the Building for a door to be installed at a minimal cost. Because it appears that not only is there already access to this area, but even more access could become available by installation of a door, the Court concludes that this area must be included in any valuation and cannot be completely disregarded.

Similarly, in reaching his Sales Comparison Value of the 800 Building, Mr. Sloan again determined that vacant space was "essentially not usable," and "having no contribution." Therefore, the sales he used to compare to the 800 Building were based on 41,300 square feet, as opposed to the actual size of the Building. As previously stated, the Court believes there is use for the vacant space, and it should be assigned some value.

Mr. Sloan's comparables included properties in West Frankfort, Illinois, Glasgow, Kentucky, and Owensboro, Kentucky. (Exhibit C, pg. 31). Based on the comparables, Mr. Sloan assigned the value per square foot of the 800 Building as $24.75. He multiplied this value by 41,300 square feet to reach a value of $1,022,000.00. (Exhibit C, pg. 35) Again, Mr. Sloan did not account for the vacant space in the Building that the Court has determined has some value. Multiplying Mr. Sloan's value of $24.75 by the actual area of the Building, (66,920 square feet) results in the Court's Modified Comparable Sales Value of $1,656,270.00.

**III.    The Court's Valuation**

In examining the Income Capitalization Approach of both appraisers, the Court notes that the total expenses they used in calculating the Net Operating Income varies by approximately $60,000.00. This was due in large part to the amount each appraiser used for the real estate tax expense. Mr. Dinan deducted $87,577.00 based on the 2019 real estate tax bill of $87,577.00 (Exhibit A, pg. 92), while Mr. Sloan used an estimated number of $20,000.00 (Exhibit C, pg. 43). Mr. Sloan's research indicates that in 2019, the real estate was subject to a special service tax district rate that caused the property to be taxed at a higher rate of 33.857040% (Exhibit C, pg. 11). Realizing the special service district rate is no longer in existence, Mr. Sloan used the most recent tax rate for surrounding properties of 7.5907% (Exhibit C, pg. 40). The Court believes Mr. Sloan's tax rate to be more accurate. Accounting for a higher building value than reflected on the tax assessment used by Mr. Sloan, the Court adjusts the expenses to reflect real estate taxes of approximately $38,000.00. Averaging the remaining expenses by the two appraisers leads the Court to arrive at expenses totaling approximately $156,000.00. Subtracting this amount from Mr. Dinan's Effective Gross Income figure of $288,417.00 (Exhibit A, pg. 92),

which more accurately includes all of the potential rental income,[1] results in an adjusted Net Operating Income of $132,417.00.

Having established a more accurate Net Operating Income, the Court divides this value by a capitalization rate of 8.25%, which is the average of the capitalization rates suggested by Mr. Dinan of 7% and Mr. Sloan of 9.5%. This results in an estimated market value of $1,600,000.00 based upon the Income Capitalization Approach.

Averaging the Court's Modified Sales Comparison Approach Value of $1,434,111.00 based on Mr. Dinan's appraisal with the Court's Modified Comparable Sales Value, based on Mr. Sloan's appraisal of $1,656,270.00, results in an Average Sales Comparison Value of $1,545,190.50.00.

Considering the above calculations and the numerous factors affecting the industry and the Mall itself, the Court concludes that the value of the 800 Building is $1,550,000.00. As discussed *supra,* the lack of valuable information provided in the appraisals of the Mall requires the Court to determine the ultimate value of the Mall by subtracting the value of the 800 Building from the actual sale price of the properties. The Mall and 800 Building sold for $3,200,000.00. Because the Court values the 800 Building at $1,550,000.00, it is logical to conclude that the value of the Mall is $1,650,000.00.

### IV.    Conclusion

For the reasons stated herein, the Court determines that the value of the 800 Building is $1,550,000.00, and the value of the Illinois Star Centre Mall is $1,650,000.00.

ENTERED: September 30, 2021

/s/ Laura K. Grandy
UNITED STATES BANKRUPTCY JUDGE

---

[1] The Court notes that Mr. Sloan's Net Operating Income figure excludes the entire vacant portion of the Building and was calculated by using an area of 41,300 square feet, instead of the area of the entire Building.